IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
March 31, 2025
LAURA A. AUSTIN, CLERK
BY: s/ FELICIA CLARK
    DEPUTY CLERK

| | |
|---|---|
| **CLINTON MARTIN,** | ) |
| | ) |
| Plaintiff, | ) Case No. 1:23CV00029 |
| | ) |
| v. | ) **OPINION AND ORDER** |
| | ) |
| **SUMMIT ENVIRONMENTAL SERVICES, LLC, and JOE EVANS,** | ) JUDGE JAMES P. JONES |
| | ) |
| Defendants. | ) |

*Argued:* Travis A. Griffith, GRIFFITH LAW CENTER, PLLC, Charleston, West Virginia, *for Plaintiff;* Caine J. Caverly, JACKSON LEWIS P.C., Richmond, Virginia, *for Defendants.*

The plaintiff alleges that his employer discriminated against him based on race and retaliated against him for reporting racial allegations. The defendants move for summary judgment on his 42 U.S.C. § 1981 claim for discrimination and retaliation on the basis of race and on his Virginia state law claim for intentional infliction of emotional distress. For the following reasons, I will grant summary judgment in favor of the defendants.

I. BACKGROUND.

Plaintiff Clinton Martin, who is Black, was hired in August 2022 as a laborer for the industrial cleaning of a coal-powered energy plant, called the Virginia City

Hybrid Energy Center located in St. Paul, Virginia. When plants such as this need to be cleaned, sections of it are systematically shut down in what is referred to as "Outage Projects." Summit Environmental Services (Summit), one of the defendants, performs Outage Projects for different power plants, including the Virginia City plant at issue here.

An Outage Project requires different numbers of workers throughout its stages. At the beginning it requires fewer workers than when work begins in full. At its peak, the Virginia City Outage Project required large numbers of temporary workers, some of whom were hired from the International Union Painters and Allied Trades Council 53 (IUPAT 53). Martin joined IUPAT 53 in March 2022, and was hired by Summit for a different Outage Project in April. His role there ended in May, and Summit hired him again for the Virginia City Outage Project.

Martin's first shift for the Virginia City Outage Project began on August 25, 2022. Martin's immediate supervisor was Travis Lawson, a shift supervisor. Joe Evans, who is also a defendant in this case, served as the principal supervisor for Summit's work.

Beginning in August, Martin and other workers performed pre-Outage work to prepare for the general Outage. The Plant Outage began in full around the first week of September. Martin always worked on the night shift, referred to as the second shift. He claims in his deposition that the number of workers on the second

shift did not increase with the ramp up, but the defendants present staffing schedule evidence that shows that it did. In addition to working at the plant, Martin drove the Summit-provided van that carried other second shift union workers to and from their nearby hotel.

Part of Martin's work at the plant involved hydroblasting. This required Martin and other workers to wear rainsuits while they sprayed water in enclosed spaces to clean the plant. These suits would result in an increased amount of perspiration for the wearer. As a result, Martin and other workers would be wet during lunchtime, which happened at night when temperatures were cool.

Martin alleges that he was discriminated against based on his race because of two changes made to the daily routines of the second shift workers. During the pre-Outage period, which lasted about for about two weeks, the workers on the second shift were permitted to eat lunch in a heated trailer. Martin was also permitted to park the Summit van inside the gate of the worksite in the upper parking lot.

However, around the time the Outage began, Martin was told that he and the other temporary workers would not be permitted to eat lunch in the trailer. Instead, a tent had been purchased and set up next to the trailer, under which they were told they could eat. Because it was cool, Martin attempted to eat lunch in the van. But he was told that he could not do so because the van needed to be taken by someone else for refueling during the break. Without access to the heated trailer, Martin

claims he was subjected to discomfort. Zipped-on sides were later added to the tent, along with heaters and tables, where before the tent only had chairs available. Mem. Opp'n Mot. Summ. J. Ex. B, Martin Dep. 111, ECF No. 46-2. Martin was also told that the van would have to be parked outside the gate in the lower lot, unlike other Summit vehicles that could continue to be parked inside the gate in the upper lot, causing Martin and other temporary workers to walk further.

After being told that the temporary workers could not eat lunch in the trailer, Martin discussed the new policy with his coworkers. Martin describes his concern as being that all the temporary workers were Black, while the Summit workers still permitted to use the trailer were white. *Id*. at 70–71. He then complained about these changes via texts to his union representative, Steve Hicks. No date is provided for these texts, but Martin stated in his deposition that he was told about not eating in the trailer on the same day that the tent appeared next to the trailer. The defendants submitted into evidence a receipt for the purchase of a 17-foot portable tent, dated September 7, 2022, around the time that the Outage Project began in full.

On September 12, Martin was released from his duties. Martin alleges that this was done in retaliation for notifying his union representative about his complaints, while the defendants claim that the Outage Project was winding down and did not need as many workers. They assert that Martin and another union worker, Ernest Breckenridge, who is also Black, were selected to be released from

their duties because Martin had said he needed to attend to a medical appointment, while Breckenridge said that he had home issues he needed to address. Martin disputes this. He claims that after union representee Hicks forwarded his texts to the boss Evans, Evans terminated his employment in retaliation.

The Motion for Summary Judgment has been fully briefed and argued and is ripe for decision.

## II. STANDARD OF REVIEW.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the court must view "all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022) (internal quotation marks and citations omitted).

A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted). "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

### III. DISCRIMINATION AND RETALIATION ON THE BASIS OF RACE.

Section 1981 of Title 42 prohibits discrimination on the basis of race. The methods of proof of a claim under § 1981 are the same as under title VII. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). "A plaintiff may prove discrimination through either of two methods: (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (citation omitted). Here, Martin does not provide direct evidence of discriminatory or retaliatory animus.

A plaintiff claiming unlawful discrimination who does not offer direct evidence must establish a prima facie case of discrimination. The plaintiff must show that "(1) [he] is a member of a protected class; (2) [his] employer took an adverse action against [him]; (3) [he] had been fulfilling [his] employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–650 (4th Cir. 2021).

To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove "(1) that [he] engaged in a protected activity," as well as "(2) that [his] employer took an adverse employment action against [him]," and "(3) that there was a causal link between the two events." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005) (citation omitted). A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015).

Once the plaintiff has made a prima facie case of discrimination, the burden shifts to the employer to provide a non-discriminatory reason for its alleged action. Finally, the plaintiff must show by a preponderance of the evidence that the reason provided by the employer is pretext for discrimination. *Wannamaker-Amos*, 126 F.4th at 255 n.4 ("While the *McDonnell Douglas* framework was initially developed for Title VII discrimination cases, it has since been held to also apply in discrimination cases arising under Section 1981.").

Assuming without deciding that Martin has made a prima facie case of discrimination and retaliation, the defendants have met their burden to provide evidence demonstrating non-discriminatory and non-retaliatory reasons for the changes in lunch and parking policies.

First, the defendants argue that Martin and the other second shift temporary workers were told not to eat in the trailer once the Outage Project began in full,

because the trailer did not have room for the increased number of workers. Summit's supervisors and operators were given priority to discuss work matters in the trailer during the lunch break. The evidence supports this claim. Martin states in his deposition that on the day the tent appeared next to the trailer, Lawson told him and the other temporary workers they could not eat lunch in the trailer. Martin Dep. 76, ECF No. 46-2. A receipt for the tent is dated September 7, 2022, at around 11:30 a.m. Mem. Supp. Mot. Summ. J. Ex. G, Receipt, ECF No. 45-7. The pre-Outage work ended, and the Outage Project began in full "in or around the first week of September 2022." *Id.* at Ex. B, Lawson Decl. 2, ECF No. 45-2. Therefore, the explanation that the defendants prioritized supervisors' access to the trailer when the number of total workers increased is supported by the evidence.

Second, the defendants argue that Martin was asked not to park the van in the upper lot closest to the worksite because that lot was reserved for Summit's supervisors and operators once the Outage Project began in full. Regular workers were not permitted to park there and instead had to park in a lower lot farther away. This policy applied to workers who were of different races. Mem. Opp'n Mot. Summ. J. Ex. F, Evans Dep. 97–98, ECF No. 46-6. The defendants therefore have provided a non-discriminatory reason for telling Martin he could no longer park in the upper lot.

Third, the defendants argue that they released Martin from his duties not because he complained about the lunch and parking policy but because the Outage Project was winding down and Martin had mentioned needing to have an eye appointment. *Id.* at 74. They also let Breckenridge, Martin's coworker, go because he had to manage an issue at his home. *Id.* Martin's and Breckenridge's last scheduled shifts were on September 11. Mem. Supp. Summ. J. Ex. I, Staffing Schedule 12, ECF No. 45-9. To support their claim that the Outage Project was winding down at that time, the defendants submitted evidence showing that the second shift had fifteen people on September 11 but only nine people the next day. *Id.* at 12–13. In other words, four other people on the second shift besides Martin and Breckenridge were also let go on the same day. The second shift's staff was further reduced to seven people on September 13. *Id.* at 14. And Martin was hired for another Summit project less than a month later. *Id.* at Ex. D, Martin Timesheets 11, ECF No. 45-4.

The evidence in the summary judgment record supports the defendants' non-discriminatory and non-retaliatory reasons for having the second shift temporary workers eat lunch outside the trailer and park in the lower lot, and for Martin and Breckenridge to be let go from work on September 11. The burden shifts to Martin to show that these reasons are pretext. Martin is unable to do so.

Martin first contends that the defendants' explanation is pretext because, after Evans was informed of Martin's texts to his union representative, Evans held a joint meeting of the first and second shift in the trailer at issue. Evans Dep. 140, ECF No. 46-6. Martin claims this shows that everyone could physically fit in the trailer at one time, and that therefore the exclusion of the union workers was discriminatory. But one of the purposes of holding the meeting in the trailer, according to Evans, was actually to demonstrate to the workers that "there was physically no way [he] could have everybody in there" at lunch time. *Id.* The fact that dozens of people could fit in the trailer for a meeting does not show that everyone on the second shift could fit in a way that made eating lunch and continuing work discussions feasible.

Martin also argues that the defendants' explanations are inconsistent and contradictory. "In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). Martin claims that he was first told he could not eat in the trailer by Lawson because "it was Joe Evans's orders." Mem. Opp'n Mot. Summ. J.18, ECF No. 46. He claims the defendants, after this suit was filed, submitted Lawson's declaration to advance a supposedly different reason, that "there were too many workers and not enough space, and that there were personal items in the trailer belonging to Summit employees." *Id.* at 18–19. And Lawson then denied in his

deposition that "Summit was concerned that some of the workers might steal other people's items in the trailer." *Id.* at Ex. A, Lawson Dep. 101, ECF No. 46-1.

However, Lawson's declaration states that the decision to exclude certain workers from the trailer "was due to the trailer's limited space, the fact that full-time workers had their own personal items/spaces in the trailer, and the need for operators and supervisors to have a space for discussing tasks to be completed during shifts." Lawson Decl. 4, ECF No. 45-2. Full-time workers having personal items and "spaces" in the trailer could just as well mean that these items and spaces took up room that could no longer be used to fit all the people on the second shift once the number of workers increased. *Id.* Lawson's declaration and deposition are therefore not inherently inconsistent, and Martin does not provide further evidence showing that they are.

Furthermore, the fact that Lawson told Martin it was Evans's orders that non-Summit workers could not eat in the trailer is again not inconsistent. Martin presents no evidence that Evans's orders were not motivated by the reasoning offered by the defendants. And, again, the fact that Evans held a meeting with all the first and second shift workers in the trailer to demonstrate that it had become too small once the work ramped up for them to comfortably discuss work and eat lunch is consistent with an explanation that the trailer was too small. Also, after Martin spoke to Evans about not being permitted to use the trailer, zipped-on sides were added to the tent,

-11-

along with heaters and tables, where before the tent only had chairs available. Martin Dep. 111, ECF No. 46-2.

Lastly, Martin argues that the reason given for his termination is also pretext. The defendants claim they released Martin because of a medical appointment he had mentioned. *See* Evans Dep. 74, ECF No. 46-6 ("Clinton had an eye appointment."); *and* Lawson Dep. 86, ECF No. 46-1 ("There was something about his eye, pressure on his eye or something like that."). Martin claims that his own deposition "directly disputes this," but the page he cites does not "directly dispute" the defendants' position. Mem. Opp'n Mot. Summ. J. 19, ECF No. 46. Instead, Martin states that he had previously been diagnosed with different ailments, including being cross eyed at birth and "borderline glaucoma." Martin Dep. 31, ECF No. 46-2. He does not cite to any other evidence to contradict the defendants' explanation.

Martin also contends that the defendants' explanation for releasing Breckenridge is pretext. The defendants claim that Breckenridge said that there was an issue with someone trying to move into his home without permission, so they released him to allow him to attend to it. Evans Dep. 79, ECF No. 46-6. Breckenridge states in his affidavit that he had never left the jobsite (presumably beyond returning to the hotel each day) or asked to leave to handle issues at home. *Id.* at Ex. D, Breckenridge Aff. 2, ECF No. 46-4. But the defendants' position is not that Breckenridge specifically asked to be released to attend to those issues. It is

-12-

that they needed to release some workers on the second shift because the Outage Project was beginning to wind down, thus requiring fewer workers, and Breckenridge and Martin had previously expressed these issues. They were therefore selected to accommodate both sides' needs. The plaintiff does not cite to evidence that contradicts this.

Martin also claims that the other IUPAT 53 workers on the second shift, all of whom were Black, left the Outage Project on the same day as Martin and Breckenridge. He argues that this demonstrates the pretext of the defendants' claim that others besides Martin and Breckenridge were released on the same day. In other words, the other workers whose last day was September 11 were not released by Summit to reduce the numbers on the second shift, but voluntarily quit in solidarity with Martin and Breckenridge. But Summit continued to release more workers the following day, which supports their argument that they were winding down the Outage Project and not targeting anyone on the basis of race. *See* Staffing Schedule 13–14, ECF No. 45-9. Furthermore, Martin was ultimately rehired by Summit for another temporary project a few weeks later. Ultimately, a reasonable jury could not find that Martin has shown the defendants' explanations are pretext.

Martin's claim for discrimination and retaliation also alleges that the defendants created a hostile work environment. To prevail on a claim of a hostile work environment under § 1981, "a plaintiff must show that there is (1) unwelcome

conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto*, 786 F.3d at 277 (citation omitted).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Here, a reasonable jury could not find that the allegations rise to a level of a hostile work environment. Martin makes no allegation that any employee besides Evans was ever racist. Martin Dep. 86, ECF No. 46-2. And he does not allege that Evans made racist or otherwise derogatory comments or jokes about him or anyone else. Being denied access to the trailer at lunch and the upper parking lot are not of a severity to constitute an abusive work environment.

Because Martin has not shown that he was subject to a hostile work environment or that the defendants' explanation for the allegedly discriminatory and retaliatory actions is pretextual, I will grant summary judgment to the defendants on Count One.

IV.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

To state a claim for intentional infliction of emotional distress (IIED) under Virginia law, a plaintiff must show that the defendant's "extreme and outrageous conduct intentionally or recklessly" caused the plaintiff's severe emotional distress. *Womack v. Eldrige*, 210 S.E.2d 145, 147 (Va. 1974). IIED requires conduct that "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hudgins v. Higginbotham*, No. CL10-2160, 2011 WL 12678215 at *5 (Va. Cir. Ct. Feb. 1, 2011) (internal quotations and citation omitted).

Discriminatory statements, without more, are generally insufficient under Virginia law to constitute outrageous conduct. *See id.* (holding that a pool director had not engaged in such conduct when he told Black plaintiff she did not look like she lived in the neighborhood and needed to leave the community pool, and then threatened to follow her home to verify her identity). Here, Martin does not allege that anyone made discriminatory statements against him. And being told to eat lunch in a tent instead of a trailer, and to park in the lower lot instead of the upper lot, are not so extreme or outrageous as to constitute IIED. Indeed, a heater was added to the tent, along with sides, to keep the cold out. And other workers parked in the lower lot, as well.

Furthermore, the meeting Evans held with the first and second shift in the trailer does not constitute IIED. Martin alleges that he was "singled out in front of two shifts of workers after making a racial discrimination complaint." Mem. Opp'n Mot. Summ. J. 28, ECF No. 46. Indeed, during the meeting, Evans asked Martin and Breckenridge if they thought he was racist. Evans Dep. 140–141, ECF No. 46-6. They denied it, but Martin objects to being put on the spot in that situation. However, Evans's decision to address the racism allegations in front of both shifts, while perhaps objectionable, does not rise to the quantum required by Virginia case law. The allegations, taken together, do not "go beyond all possible bounds of decency." *Hudgins*, 2011 WL 12678215 at *5 (internal quotation marks and citation omitted).

Because a reasonable jury could not find for the plaintiff on the IIED claim, I will grant summary judgment to the defendants on Count Two.

V. CONCLUSION.

Because Martin is unable to show that the defendants' explanation for the alleged discriminatory and retaliatory conduct is pretext, and cannot demonstrate the intentional infliction of emotional distress, the defendants' Renewed Motion for Summary Judgment, ECF No. 44, and initial Motion for Summary Judgment, ECF No. 29, are GRANTED. A separate final judgment in favor of the defendants will be entered herewith.

It is so **ORDERED**.

ENTER: March 31, 2025

/s/ JAMES P. JONES
Senior United States District Judge